## STEELE vs. BROWN.

1. Where one of several sureties agrees with the principal debtor, that—if he will consent to a sale of property, mortgaged by him to the creditor to secure the payment of the debt, and without whose consent, it being a time when the property would not be likely to bring its full value, the creditor would not have sold it,—he (the surety) will buy it, should it sell for less than its value, and hold it as a common indemnity for himself and co-sureties, the prejudice to the principal, the probable benefit to the surety, and, considered as a mere change of the surety, the substitution of the one surety for the other, is each a sufficient consideration to support the agreement, and the purchase being made in accordance therewith, a trust immediately arises in favor of the co-sureties, which may be enforced at their instance.

2. In such case, the surety, so purchasing, is responsible for the property, with its proceeds and profits, and for all losses, which the care and dili-

gence, for which trustees are bound, could have prevented; and he should be allowed the sum paid for the property, with interest, unless that has in some other way been reimbursed.

ERROR to the Chancery Court of Montgomery. Tried before the Hon. J. W. Lesesne.

ELMORE & YANCEY, for the plaintiff in error.

PRYOR, for the defendant.

PARSONS, J.—Brown states in his bill that Wilkins, in September 1837, was indebted to the Branch of the Bank of the State of Alabama at Montgomery, in the sum of about twenty thousand dollars; that Wilkins, with Brown, Steele and Walker as his sureties, made three promissory notes for the payment of this debt, to the Branch Bank—that Wilkins, at the same time, in pursuance of a previous agreement with all the parties, mortgaged a large amount of property to the Bank, to secure the payment of the money mentioned in the notes; the first of which was to mature on the first of June 1838; the second on the first of June 1839, and the third on the first of June 1840. It is further stated, that the President of the Bank, on the 9th July 1838, sold the mortgaged property, at public auction, to Steele, for the sum of $13,416 $\frac{50}{100}$, or thereabouts, and the property was conveyed to Steele. The property appears to have been sold under a power contained in the mortgage. The bill alleges that the sale was made at the request of Wilkins and some of his sureties, and that the property was bought in by Steele for the benefit of Wilkins and his sureties—Steele having agreed with Wilkins, before the sale, to buy in the property if it should sell for less than it was worth, for the benefit of Wilkins and his sureties. It is stated that the property sold for less than its value and that Steele held it, after his purchase, as a trustee, for the benefit of the sureties, as an indemnity against their liability, so far as it would go, and that he still held it, or its proceeds, for the same purpose, after deducting his advance in the purchase.

Steele's answer admits these facts substantially, except as presently stated: he denies that the sale under the mortgage was made at his request, but admits that he and Walker deemed it best that the property should be sold, and upon their repre-

sentation of this to Wilkins, he made no objection; and after that, as Steele recollects, he requested the Bank to make the sale, before proceeding against the sureties, and the sale was made. He states that before and on the day of the sale, he said to Wilkins and Walker that if the property should sell for its full value, he would let it go, but if not, he would buy it for the benefit of the sureties, and if they should have the debt to pay, the property should go towards the payment; but he denies any agreement or contract, before the sale, other or different from that stated by him, and that his statements were made voluntarily, without consideration and as mere intentions, and that they were so regarded, and influenced none of the parties, nor prevented them from bidding, or making any other arrangement, contemplated then or previously, and that he bought the property at full value. He further admits that after the sale, but on the same day, he executed an instrument to Wilkins, containing a repetition in writing of the declaration of his intentions, but he avers that the instrument was made voluntarily and without consideration, and because he did not, and does not, desire to speculate on the misfortunes of his co-surety, the complainant. This instrument is marked A and exhibited with his answer. It thereby appears, what property he purchased under the mortgage, which is refered to by the instrument, and the price, and that he agreed to convey the same property to Wilkins, who was to refund the amount Steele bid for it, and procure for him a release from the debts to the Bank for which the mortgage was executed, or in the event of failing in the first payment therein mentioned, the property was to be sold for the benefit of all concerned in the mortgage. It does not appear by the instrument that the title to the property passed out of Steele, but only that he was to make a quit claim conveyance of it to Wilkins, in the event of his performing as mentioned. He denies that he held or holds the property or its proceeds, as trustee, liable to account to any one, but he holds it as his own and pleads the want of consideration.

Wilkins deposes that Steele, in the early part of the year 1838, in the absence of Brown, who was out of the State, appeared to be uneasy about the debts, and desired him to allow the Bank to sell the property and promised to bid it in and to give him, Wilkins, a chance to redeem it, and that the property

was accordingly sold by the Bank and bid in by Steele, who allowed Wilkins to retain the possession, agreeably to a previous understanding; and he proves the execution of the instrument marked A. He states that there was a distinct understanding that Steele was to purchase the property, unless it brought its full value, and to let him keep it and try to work out the debt, and that he would not have suffered it to be sold at such a season but for Steele's promise; that the Bank would not then have sold without his consent; that afterwards it was found impossible for him, Wilkins, to make the first payment to the Bank, without some assistance, and it was therefore agreed by Steele and him to sell five of the negroes, which was done for $4,301 95, which went to Steele; and he mentions another sale, the proceeds of which went to Steele on account of his liability for him to the Bank. He proves various transactions with and payments to Steele, sufficient to discharge the debts for which Brown, Steele and Walker were sureties, all subsequent to the sale under the mortgage. Walker deposes that Steele stated to him that he wished the property sold under the mortgage, as Wilkins was largely in debt, the more effectually to secure the title to Steele, Brown and himself, as sureties of Wilkins, but he said if any person should bid what the property was worth at that time, it should go for the payment of the debt; and if there was no bidder for it at what Steele or Steele and Walker thought it was worth, he would buy it himself and dispose of it in payment of the debt for which it was bound, at their mutual risk and expense. These declarations were made on the day of sale, but they had no influence with him with regard to buying the property.

Allen deposes that after the sale some time, Wilkins and Steele were in conversation about one of the transactions between them, when Wilkins observed, "Now this settles all matters between us about the Bank debt"—to which Steele assented. The transaction was this, that Allen gave to Steele a note on account of some of the mortgaged property he had bought of Steele, and which Steele had purchased at the sale under the mortgage. The note was to be placed in Bank in lieu of Steele's liability or note for Wilkins, by an agreement between Steele and Wilkins. The note was placed in Bank, or at least he paid it to the Bank.

There is in evidence the transcript of a suit in chancery, which Brown brought against Steele and others, relative to the transactions involved in this case. That suit was disposed of, and it is material now only as evidence. Steele's answer in that suit was sworn to on the 20th October, 1841. He admits his purchase at the sale under the mortgage, but states that he purchased the property at a fair price, and then he states more specifically as follows: "This defendant further answering, says, that he has held and still holds all the property purchased by him as aforesaid from said Bank, and all the proceeds and profits arising therefrom in any wise or manner, for the benefit of all the sureties upon the said notes of Wilkins, and he does this, not from any legal obligation upon him, but from a desire to protect the interests of all concerned and a sense of moral justice, and that he has never applied one dollar received from sales of said property in a manner inconsistent with this declaration and the rights of the complainant, nor has he applied money so received, except in the manner hereinafter stated." There is much other evidence in the case before us, circumstantial and otherwise; upon all of which we have no hesitation in the conclusion that one of the material allegations in the bill is sustained by the evidence, to-wit, that the sale was made at the request of Wilkins and some of his sureties, and the property bought in by Steele for the benefit of Wilkins and his sureties, Steele having agreed with Wilkins before the sale to buy in the property, if it should sell for less than it was worth, for the benefit of Wilkins and his sureties. Another allegation of the bill is also well sustained by the evidence, that Steele held the property, after his purchase, as trustee for the benefit of the sureties, as an indemnity against their liability. For if he held for the benefit of Wilkins and his sureties, he held, of course, for the benefit of the sureties. The evidence is conclusive that for a long time he held, applied and disposed of the property and its proceeds, or part thereof, according to the objects of his purchase. The nature and objects of his purchase clearly appear by his instrument marked A, and exhibited with his answer, which instrument was but a repetition in writing of what he declared before the sale. By that instrument he very well shows the benefit intended for Wilkins and his sureties, and that he expected to be bound accordingly.

He made it a complete indemnity, to the extent of the property, against their liability. He was not to convey the property until Wilkins should procure a release of the debts, and if he failed to make the first payment mentioned in the instrument, the property was to be sold for the benefit of all concerned in the mortgage. The mortgage was refered to in the instrument and therefore to be taken as part of it, by which the certainty of the whole design appears. It appears what property was purchased by Steele at the sale and the price—what debts were secured by the mortgage and who the parties were that were "concerned in the mortgage" and intended to be indemnified by the property purchased at the sale and mentioned in the instrument. Mr. Steele's counsel, in the course of his very able argument, suggested that, as the instrument marked A provided for a sale, in the event of a failure by Wilkins to make the first payment, the arrangement as made could not operate as an indemnity for the sureties, except in the event of that particular failure. It is true, a sale in any other event is not expressly provided for; but Steele retained the legal title, and the manifest intention, as appears by the instrument, was that Wilkins should discharge all the debts; therefore he would not be entitled to the property until that was done; and Steele, by the instrument, only intended, by stating that the property should be sold in the event of default in the first payment, to mark the earliest time when a sale could be made. We think the legal effect of the instrument was that he might have sold for any default. At any rate, such a sale would have been had in chancery.

Steele, in his answer, states that he acted throughout voluntarily and pleads that there was no consideration. But we incline to think that his defence of a want of consideration is inappropriate and cannot be sustained. In the absence of Brown and without his knowledge, Steele and the other parties brought on the sale in the month of July, at a time which was unfavorable in respect of the crop and of the usual scarcity of money at such a season, as proved by Wilkins, who also testifies that he would not have consented to a sale at that time, but for Steele's promises, and he proves that the Bank would not then have required the sale to be made. The sale therefore was brought about by Steele's promises, at a time when it would not have taken place without the consent of Wilkins, and

he gave his consent at the risk of prejudice to his own rights and those of his other sureties. A prejudice, in general cases, is a consideration which will support an agreement. There was also a probable benefit to Steele in the selection of an unfavorable time for the sale, for that increased the chances of his getting control of the property. Steele states in his answer that he purchased the property at full value, and in this he is supported by the weight of evidence; but it does not appear that he thought so at the time. The inference is the other way, for he declared he would not buy if it should sell at fair prices. Yet he did buy and made no objection at that time in respect of the price, but proceeded by the instrument marked A to define the rights of the parties in conformity with his previous undertaking. We conclude, therefore, that he thought he was purchasing the property at less than its value, or intended to concede that condition and to comply with his promise, without regard to it. His execution of the instrument marked A, was an immediate act in compliance with his promise, and he suffered Wilkins to act upon that for such a length of time and to such an extent as to destroy the defence that he purchased at full value, and therefore not in pursuance of his undertaking. There is no doubt but the mortgaged property was a security or indemnity for all the securities, and they had a right to have it appropriated accordingly. The sale under the mortgage and the purchase by Steele of the property, according to the intention and understanding of the parties (Wilkins and Steele) which led to the sale, amounted in truth to nothing but a change of securities—a substitution of the new arrangement for the mortgage; whereby Steele, instead of the President of the Bank, became the trustee, and thus secured the benefit of his own skill and discretion in the line of the trust duties; and this we think was the real object of the parties. Considering the transaction as a change or substitution of securities, there is no ground at all for the plea that there was no consideration; because the mortgage, as a security, was a consideration for the new arrangement. Steele acquired the new security by means of changing the old one, and this he did upon an arrangement with Wilkins and with his assistance. It is settled that if one of several co-sureties subsequently takes a security from the principal, for his own indemnity, in enures to the common benefit

of all the sureties.—West v. Belches, 5 Munf. 187; 2 Rand. 514; Fagan v. Jacocks, 4 Dev. 263; Gregory v. Murrell, 2 Ired. Eq. 233; Field v. Pelot, 1 McMullan's Eq. 370. Sureties are bound to observe good faith towards each other.—Agnew v. Bell, 4 Watts, 31. "The indemnity which one surety takes is reached in favor of his co-surety upon the ground, either that it was intended for the benefit of all, or that the taking was a fraud upon the others. They enter into the agreement under a belief of perfect equality, trusting to the same laws of indemnity, and to the united exertions of each other to avoid harm severally." Moore v. Moore, 4 Hawks, 258-360. Here the new security arose out of the old one and was intended by Steele to enure to the common benefit of all the sureties. Or he acquired the new security, with the aid of Wilkins, by appropriating the old one—intending to gain an exclusive benefit to himself, at the expense of his co-sureties and in the absence of Brown.— Brown's right to participate in the benefit, in either case, is clear. It is true that Brown was not a party to the contract or arrangements by which the securities were changed; in fact, he knew nothing of it. But his equity arises out of the relation of co-surety, and does not depend upon his taking part in the contract or arrangements, nor upon his knowledge of them at the time. He is in no sense a volunteer. The numerous authorities, cited by Steele's counsel, do not apply in the view we have taken of the case. We have regarded Steele's answer in the former suit and his exhibit A in this suit as evidence in this cause, and not as formal declarations of trust. A formal declaration of trust is a sort of equitable title paper to the *cestui que trust*, and should have been stated in the bill, I think, if intended to be relied on as such; but we give no opinion upon the question whether they were in effect a declaration of the trust. But we cannot doubt but the trust was completely created and the relation of trustee and *cestuis que trust* established. This appears by Steele's answer in the other case, by his written instrument marked A, and the mortgage, and still more abundantly by other evidence. This disposes of the main question in the case, and we have gone over all the ground to which the argument of Mr. Steele's counsel applied.

There is no doubt but Brown is entitled to participate with Steele in every indemnity which the latter received from Wil-

kins, either directly or indirectly. There is no doubt that Steele is responsible for all he received, together with the proceeds and profits thereof, unless he can show a special excuse, and that he is responsible for losses which the care and diligence for which trustees are bound, might have prevented. It is clearly equitable, however, that among the allowances to which he may be entitled, is the sum he paid for the property at the sale under the mortgage, with interest, unless that has in some way been re-imbursed. As to the trust property and its proceeds still in the hands of Steele, or at his control, we think that ought to be first exhausted in satisfaction of the complainant's demand, but without depriving Steele of his equality of rights, before Steele is required to pay any thing in respect of the property and proceeds still in his hands or at his control. All that the chancellor has done as yet is consistent with the opinions just expressed. The accounts which he has ordered or may yet order, will place the whole case before him as it is. It is our understanding from the opinion of the chancellor, that he did not intend to charge Steele with the amount of C. D. D. Brown's note, and that it is not to be done. There is no error, we think, in the decree. It is affirmed.